## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | Case No. 3:25-cr-54 |
| | : | |
| v. | : | Judge Thomas M. Rose |
| | : | |
| DEVONTE WYATT *et al.*, | : | |
| | : | |
| Defendants. | : | |

---

### ENTRY AND ORDER DENYING MOTION TO SUPPRESS FRUITS OF SEARCH WARRANTS (DOC. NO. 34) AND SUPPLEMENTAL MEMORANDUM (DOC. NO. 40)

---

Currently before the Court is the Motion to Suppress Fruits of Search Warrants (Doc. No. 34), along with the Supplemental Memorandum (Doc No. 40) (collectively, the "Motion"), filed by Defendant Devonte Wyatt ("Wyatt").  Wyatt is one of two defendants indicted for allegedly conspiring to engage in a drug trafficking operation.  (*See* Doc. No. 5 at PageID 8–14.)  By his Motion, Wyatt seeks to suppress both the fruits obtained through four search warrants, along with any statements obtained from custodial interrogation.[1]  For the reasons articulated herein, the Court **DENIES** Wyatt's Motion.

### I.        BACKGROUND

Around August of 2021, FBI Special Agent Robert Buzzard ("Agent Buzzard") began investigating Wyatt and his cohorts for their suspected involvement in a drug trafficking operation.

---

[1] In his Motion, Wyatt seeks to suppress "[a]ny incriminating evidence and/or statements obtained in the absence of a reasonable articulable suspicion," as well as "[a]ny custodial statements taken from Defendant" which were either gathered without the proper *Miranda* warning or surrendered involuntarily. (Doc. No. 34 at PageID 89.) Because Wyatt does not identify what statements, if any, he made regarding this case, the Court limits its analysis to the evidence obtained through execution of the four search warrants.

(Doc. No. 42-1 at PageID 169.) Agent Buzzard's investigatory efforts led him to believe that 1108 Grayston Drive, Trotwood, Ohio (the "Residence") was the site of said drug operation. (*Id*.) Further investigation revealed the Residence belonged to Wylanda Heath, Wyatt's mother. (*Id*. at PageID 170.) Over the course of about four years, Agent Buzzard and other law enforcement officers continued investigating the Residence, ultimately obtaining and executing four separate search warrants.[2] (*See* Doc. Nos. 42-1, 42-2, 42-3, 42-4.) The warrants were executed on June 27, 2022 ("Search Warrant 1"); February 15, 2024 ("Search Warrant 2"); March 3, 2025 ("Search Warrant 3"); and June 30, 2025 ("Search Warrant 4") (collectively, the "Search Warrants"). (Doc. Nos. 42-1 at PageID 164; 42-2 at PageID 193; 42-3 at PageID 203; 42-4 at PageID 244.) Search Warrants 1, 2, and 4 authorized searches of the Residence and yielded various items including, methamphetamine and fentanyl, various firearms, drug manufacturing equipment, large quantities of money, baggies with drug residue, various cellphones, and a DVR. (*See* Doc. Nos. 42-1 at PageID 182–84; 42-2 at PageID 194–201; 42-4 at PageID 263–71.) Search Warrant 3 authorized a search of the eight cellphones and DVR secured during the execution of Search Warrant 2. (Doc. No. 42-3 at PageID 204–11.) The execution of Search Warrant 3 yielded call logs, photographs, recordings of visitors coming and going from the Residence, and other forms of electronically stored data. (*Id*. at PageID 215–23.)

Wyatt now seeks to suppress the evidence gleaned from all four searches. (*See* Doc. Nos. 34, 40.) To that end, Wyatt filed his Motion to Suppress on September 26, 2025. (Doc. No. 34.) That same day, Wyatt filed a Motion for *Franks* Hearing. (Doc. No. 35.) The Court held a hearing on November 18, 2025, but ultimately denied Wyatt's Motion for *Franks* Hearing, finding that he failed to meet his burden in order to avail himself of a *Franks* hearing. (Doc. No. 38.) The Court

---

[2] For simplicity's sake, the court uses "search warrants" to refer to both the warrants and accompanying affidavits. The Court expounds on the contents of each search warrant in greater detail below.

thereafter set a briefing schedule (Doc. No. 39) regarding Wyatt's Motion to Suppress, limited to a four corners challenge. Accordingly, Wyatt filed his Supplemental Memorandum Supporting his Motion to Suppress on December 8, 2025. (Doc. No. 40.) The Government responded on December 18, 2025. (Doc. No. 42.) Wyatt did not file a reply. Consequently, the instant matter is ripe for review and decision.

## II.  <u>LEGAL STANDARD</u>

A criminal defendant may seek the suppression of evidence by filing a pretrial motion with the Court. FED. R. CRIM. P. 12(b)(3)(C). "It is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression." *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003). When a party seeks to challenge an allegedly unconstitutional search, the Fourth Amendment governs. *See Colson v. City of Alcoa*, 37 F.4th 1182, 1186 (6th Cir. 2022). At bottom, the Fourth Amendment of the Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV. Under the Fourth Amendment, law enforcement may generally not conduct a search before obtaining "a warrant from a neutral and disinterested magistrate." *Franks v. Delaware*, 438 U.S. 154, 164 (1978). To this end, it is expected that a magistrate will not issue a search warrant without a showing of probable cause to justify the requested search. *United States v. Abboud*, 438 F.3d 554, 569 (6th Cir. 2006) ("Only if the magistrate finds probable cause can she issue a search warrant"). Altogether, the Fourth Amendment protects against unreasonable searches and seizures by "requiring that [the usual inferences which reasonable men draw from

3

evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime." *Illinois v. Gates*, 462 U.S. 213, 240 (1983) (quoting *Johnson v. United States*, 333 U.S. 10, 13-14 (1948)) (alterations in original).

When applying for a search warrant, the government necessarily bears the burden of establishing probable cause. *Abboud*, 438 F.3d at 569 (citing FED. R. CRIM. P. 41(c); *United States v. Weaver*, 99 F.3d 1372, 1377 (6th Cir. 1996)). To meet its burden, the government is expected to offer an affidavit containing "facts that indicate 'a fair probability that evidence of a crime will be located on the premises of the proposed search.'" *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (quoting *United States v. Jenkins*, 396 F.3d 751, 760 (6th Cir. 2005)). The government need not possess evidence that would secure a conviction beyond a reasonable doubt. *Wong Sun v. U.S.*, 371 U.S. 471, 479 (1963). Rather, "probable cause is a fluid concept" inherently tied to "an assessment of probabilities" and based on variable and particularized facts. *Gates*, 462 U.S. at 231.

Magistrate judges reviewing an affidavit for probable cause must draw from the totality-of-the-circumstances presented in the government's affidavit. *See id.*; *see also Wong Sun*, 371 U.S. at 479 (probable cause "must be measured by the facts of the particular case"). By the totality of the circumstances, a magistrate's probable cause determination will generally stand when she had a substantial basis for concluding that the search would turn up evidence of criminality. *Gates*, 462 U.S. at 236 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). In the end, whatever lies within the four corners of the government's affidavit will dictate whether a magistrate had a substantial basis for her probable cause determination. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citing *United States v. Pinson*, 321 F.3d 558, 565 (6th Cir. 2003)). Moreover, a

4

magistrate judge's probable cause determination should most often "be paid great deference." *Gates*, 462 U.S. at 236 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)).

With certain exceptions, any evidence obtained as a result of an unlawful search cannot be used as evidence against the victim of the search. *Wong Sun*, 371 U.S. at 484 (citing *Weeks v. United States*, 232 U.S. 383 (1914)). One such exception to the exclusionary rule is the good-faith reliance exception. *See United States v. Leon*, 468 U.S. 897, 905 (1984). "Though evidence obtained in violation of the Fourth Amendment is generally excluded, the Supreme Court has held that the exclusionary rule 'should be modified so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective.'" *Frazier*, 423 F.3d at 533 (quoting *Leon*, 468 U.S. at 905). In assessing whether an officer's reliance meets this exception, the "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 922 n. 3. In so doing, courts are to consider "all of the circumstances" surrounding the search warrant application. *Id*.

## III.   <u>ANALYSIS</u>

At their core, Wyatt's arguments in favor of suppression can be condensed into two overarching contentions. First, Wyatt argues the magistrate judges lacked a substantial basis to make probable cause findings in order to issue all four Search Warrants based on the affidavits provided. (Doc. No. 40 at PageID 109–14, 124–27.) Second, Wyatt believes that, even if the Search Warrants had been supported by probable cause, the good-faith reliance exception does not apply. (*Id*. at PageID 119–24.) The Court takes up each Search Warrant in turn.

A. **<u>Search Warrant 1</u>**

As a preliminary matter, the Court finds it prudent to address a particular trope appearing in the portion of Wyatt's Motion designated for challenging Search Warrant 1. On a few occasions, Wyatt calls into question the veracity of the affiant's representations in the affidavit:

> Had the informant ever seen the inside of the property, that would've been said to our affiant, and our affiant would've put that in the affidavit. It's not there, because it wasn't said – but we certainly know that the question was asked.

(Doc. No. 40 at PageID 112.)

> Agent Buzzard understands that noting "multiple cars" visited the Graystone property on the single day of surveillance, equates to intentionally omitting important information that the magistrate needs to make an independent assessment (i.e., the actual number). If anyone in the local law-enforcement ranks[] understands the corner cutting here, it is Agent Buzzard.

(*Id*. at PageID 123.) To the extent Wyatt argues the affiant made material misrepresentations or omissions in the affidavit, that attempt is not well-taken. The proper vehicle for such challenges is a *Franks* hearing. *See United States v. Fitts*, No. 3:19-CR-75, 2020 WL 2839289, at *7 (E.D. Tenn. June 1, 2020) ("Though a reviewing court is generally limited to the four corners of the affidavit, a *Franks* hearing permits a defendant to present evidence concerning the veracity of challenged statements in the search warrant affidavit. To qualify for this exceptional procedure, a defendant must make a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit and the allegedly false statement is necessary to the finding of probable cause." (internal citations and quotation marks omitted)). Thus, Wyatt certainly could have—in theory—supplied evidence of material misrepresentations or omissions at the hearing held on November 18, 2025. And yet, he

did not. Therefore, the Court herein limits its analysis to a four corners review, turning first to Search Warrant 1.

Agent Buzzard served as the affiant for Search Warrant 1. (Doc. No. 42-1 at PageID 164.) In his affidavit, Agent Buzzard provides that his investigation began around August of 2021 when Confidential Source 1 ("CS1"), who had provided reliable information in drug cases in the past, contacted Agent Buzzard and identified the Residence as a drug stash house. (*Id*. at PageID 169.) CS1 also identified Wyatt and informed Agent Buzzard that Wyatt was a "drug trafficker who conducts car-to-car/hand-to-hand drug sales in the area of his residence." (*Id*.) According to Agent Buzzard, CS1 claimed to have personally observed Wyatt with firearms and narcotics. (*Id*.) CS1 was also able to identify Wyatt's Instagram account, which revealed a photo of Wyatt holding a large quantity of money while "standing inside what CS1 believed to be [the Residence]." (*Id*.)

After conducting a property records search and identifying the Residence as one belonging to Wyatt's mother, Agent Buzzard met with Confidential Source 2 ("CS2"), who had also provided reliable information in other investigations. (*Id*. at PageID 170.) CS2 informed Agent Buzzard that Wyatt was a "large-scale drug trafficker selling fentanyl and methamphetamine . . . ." (*Id*.) In fact, CS2 had allegedly purchased fentanyl from Wyatt in the past and had been told by Wyatt that he also had methamphetamine for purchase. (*Id*.) Notably, "CS2 identified [the Residence] as Wyatt's drug stash house." (*Id*.) Much like CS1, CS2 recognized Wyatt's Instagram account and advised that Wyatt "frequently posts photographs inside [the Residence] depicting multiple firearms, multiple 'money phones,' and large sums of U.S. currency." (*Id*.) CS2 explained that certain posts on Wyatt's account depicted Wyatt inside the Residence and indicated Wyatt was blending narcotics with cutting agents. (*Id*. at PageID 171.) One of Wyatt's posts also contained the caption, "King pin dreams trap house jumpin got my paper right they can't tell me nothing." (*Id*.) Based on

his years of experience, Agent Buzzard understood "trap house" to signify "a location (residence) where [drug traffickers] mix, store, package, and sell narcotics." (*Id*.)

Agent Buzzard thereafter sought out to verify CS1 and CS2's accounts by conducting independent surveillance of the Residence. (*Id*.) "During that surveillance, multiple vehicles and individuals were observed coming and going from the residence." (*Id*.) For instance, Agent Buzzard observed Wyatt operating a black Infinity sedan, which Agent Buzzard later found belonged to Wyatt's mother. (*Id*.) Law enforcement also observed a white sedan leave the Residence, travel to another location, park next to a different vehicle, and conduct what was believed to be a car-to-car narcotics transaction. (*Id*. at PageID 172.) Occupants of the same sedan were seen performing a similar sequence about an hour later. (*Id*.)

On June 13, 2022, while conducting surveillance in Wyatt's neighborhood, law enforcement observed another suspected car-to-car narcotics transaction. (*Id*.) The officers then initiated a traffic stop of the suspected purchaser's vehicle and interviewed the purchaser, who admitted they had just purchased drugs from the occupant of the other vehicle. (*Id*.) Law enforcement thereafter enlisted the purchaser as Confidential Informant 3 ("CS3"). (*Id*.) There is no indication that CS3 had served as a confidential informant prior to this enlistment. Law enforcement tasked CS3 with engaging in a controlled buy from Wyatt. (*Id*.) CS3 placed a call to Wyatt's phone, and Wyatt directed CS3 to the same residential area as the previously observed transaction to effectuate the sale. (*Id*.) Officers stationed at the Residence allegedly observed a maroon sedan leave the Residence, proceed to the agreed-upon location, pull up next to CS3's vehicle, and exchange drugs for money. (*Id*. at PageID 172–73.) Wyatt was thereafter seen returning to the Residence. (*Id*. at PageID 173.) Agent Buzzard conducted a field test of the

8

purchased substance, which revealed a quantity of fentanyl. (*Id*.) Agent Buzzard also noticed a purple tint in the substance, which he believed to be a cutting agent. (*Id*.)

Finally, on June 27, 2022, Agent Buzzard returned to the Residence and observed the maroon sedan that was involved in the controlled buy parked next to the Residence. (*Id*.) He also saw trash receptacles located on the public street directly in front of the Residence. (*Id*.) When conducting a "trash pull," Agent Buzzard located four plastic baggies, one of which "contained suspected drug residue that possessed a purple tint consistent with the color of the fentanyl purchased from Wyatt" by CS3. (*Id*. at PageID 173–74.) In addition, Agent Buzzard found a respirator mask, which he knew from experience was commonly used when mixing, cutting, and packaging fentanyl. (*Id*. at PageID 174.)

Based on the evidence gleaned from the three confidential informants, along with his independent investigation, Agent Buzzard applied for Search Warrant 1 on June 27, 2022. (*Id*.) Predicated on the above, Magistrate Judge Caroline Gentry issued Search Warrant 1, which authorized a search of the Residence and surrounding curtilage. (*Id*. at PageID 174–75.) Among other things, the execution of Search Warrant 1 yielded various firearms, drug manufacturing equipment, fentanyl, cutting agents, a ledger, phones, and a large quantity of money. (*Id*. at PageID 182–84.)

Wyatt takes issue with Magistrate Judge Gentry's probable cause finding for a variety of reasons. First and most pervasively, Wyatt argues Search Warrant 1 provides no indication CS1 or CS2 had ever personally been inside the Residence or were familiar with the interior of the Residence; therefore, they lacked a substantial basis for their knowledge regarding whether the pictures from Wyatt's Instagram were taken in the Residence or if drug operations were conducted there. (Doc. No. 40 at PageID 109–10, 112.) In a similar vein, Wyatt finds CS1 and CS2's

9

information lacking because, based on Search Warrant 1, neither had personally observed Wyatt with drugs or firearms in the Residence, only in a vehicle. (*Id*.)

Wyatt is correct in his contention that a factor to be considered in assessing the utility of a confidential informant's account is the basis of his knowledge. *Gates*, 462 U.S. at 230. However, Wyatt applies too exacting a standard. Indeed, the Sixth Circuit addressed this very issue in *United States v. Jenkins*, where the defendants attempted to argue the affidavit presented an insufficient nexus between the alleged criminal activity and the residence because it did not indicate the informant purchased drugs while in the residence or personally observed drugs in the residence. 743 F. App'x at 644. The Sixth Circuit rejected this argument, finding "such a level of involvement is not required for a finding of probable cause." *Id*.; *see also United States v. Gunter*, 266 F. App'x 415 (6th Cir. 2008) (holding an affidavit that "describes an incident where law enforcement agents observed Defendant visiting his residence right before he traveled to the site of the drug sale" was "sufficient to establish a nexus between Defendant's illegal activities and his residence"). Here, the facts of this case fall squarely within the purview of the rule espoused by the Sixth Circuit. While Search Warrant 1 does not provide CS1 or CS2 had personally been in the Residence, they could identify Wyatt and vouch for Wyatt's reputation as a known drug dealer, confirm they had personally seen Wyatt with drugs and guns, attest to the Residence's use as a drug stash house, and provide context for the photos from Wyatt's Instagram posts. (*See* Doc. No. 42-1 at PageID 169–70.) And perhaps more notably, Agent Buzzard did not merely rely on the word of CS1 or CS2; instead, he spoke with another confidential informant and conducted his own thorough investigation to corroborate each account. (*Id*. at PageID 169–74.) The Court thus finds Wyatt's basis-of-knowledge argument unavailing.

Next, Wyatt disputes CS2's credibility and reliability. (Doc. No. 40 at PageID 111.) Wyatt believes Search Warrant 1 provides no more than a conclusory statement about CS2's reliability in the past. First, the Court disagrees that Agent Buzzard's assertion regarding CS2's reliability is insufficient because "Sixth Circuit precedent clearly establishes that the affiant need only specify that the confidential informant has given accurate information in the past to qualify as reliable." *United States v. Greene*, 250 F.3d 471, 480 (6th Cir. 2001) Second, although conclusory assertions of a confidential informant's reliability are generally disfavored, such statements are not to be viewed in a vacuum. *See United States v. Allen*, 211 F.3d 970, 975–76 (6th Cir. 2000). "[A]n affidavit that supplies little information concerning an informant's reliability may support a finding of probable cause, under the totality of the circumstances, if it includes sufficient corroborating information." *United States v. Woosley*, 361 F.3d 924, 927 (6th Cir. 2004). For instance, "[k]nowledge of illegal drug activities, obtained by law enforcement officials through a confidential informant and independent surveillance, supports a district court's finding of probable cause to support the issuance of a warrant." *United States v. Jones*, 159 F.3d 969, 974 (6th Cir. 1998). As detailed above, that is exactly what occurred here. So even if Agent Buzzard's assertion of CS2's reliability was brief, his discussions with the two additional confidential informants, along with his independent investigation—including, the controlled buy, surveillance of the Residence on multiple occasions, and the trash pull—are sufficient to support a probable cause finding.

For his next argument, Wyatt avers that Agent Buzzard's lack of specificity is problematic. (Doc. No. 40 at PageID 113.) More particularly, Wyatt takes issue with the following language contained in Search Warrant 1: "During that surveillance, multiple vehicles and individuals were observed coming and going from the residence." (*Id*.) The use of the term, "multiple vehicles," or

so Wyatt's argument goes, fails to provide the requisite specificity for a magistrate judge to make an informed probable cause determination. (*Id*.) But any discord over the vagueness of that term is cured by the subsequent paragraphs, in which Agent Buzzard provides a detailed account of the cars and individuals coming and going from the Residence. For example, the affidavit recounts a black sedan driven by Wyatt, a white sedan, and a maroon sedan all coming and going from the Residence on various separate occasions. (Doc. No. 42-1 at PageID 171–73.) And, contrary to Wyatt's apparent contention, reviewing courts should refrain from engaging "in line-by-line scrutiny of the warrant application's affidavit[,]" and instead opt for a "totality of the circumstances approach" in reviewing the sufficiency of a warrant affidavit. *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008). In so doing, the Court here finds Agent Buzzard's use of the term, "multiple vehicles," accompanied by his more thorough explanation in the succeeding paragraphs, supports a probable cause finding.

Wyatt next takes issue with CS3, who was purportedly "unvouched-for," not searched prior to the controlled buy, and not wearing any recording equipment during the controlled buy. (Doc. No. 40 at PageID 114.)  First, "there is no need for an informant to have provided credible information to police on multiple prior occasions for a court to recognize his or her reliability or credit his or her basis of knowledge." *United States v. Simpson*, 706 F. Supp. 3d 722, 733 (E.D. Ky. 2023), *aff'd*, 2025 WL 3535700 (6th Cir. Aug. 4, 2025). Second, there exists no rule dictating an informant must be searched prior to a controlled buy. *See United States v. White*, 990 F.3d 488, 492–93 (6th Cir. 2021). Finally, Wyatt cites to no caselaw demanding that a confidential informant wear a recording device during a controlled buy. *See United States v. Hawkins*, 278 F. App'x 629, 635 (6th Cir. 2008) (finding probable cause where the officer took the "necessary precautions before and after the [unrecorded,] orchestrated purchase").

12

Wyatt's final argument in favor of suppressing the fruits of Search Warrant 1 rests on the fact that law enforcement failed to test the residue found on the baggies during the trash pull. (Doc. No. 40 at PageID 114.) It bears reiterating that, while Agent Buzzard does not indicate whether he tested the residue on the baggies from the trash pull, the drugs from the controlled buy tested positive for fentanyl, and both the fentanyl and the residue on the baggies from the trash pull contained the same purple substance, which Agent Buzzard believed to be a cutting agent. (Doc. No. 42-1 at PageID 173–74.) Even so, this fact alone does not justify suppression. *See Gaines v. United States*, No. 1:02-CR-0039, 2013 WL 774207 (N.D. Ohio Feb. 27, 2013) (finding probable cause based on the totality of the circumstances even where the officer did not test the suspected drugs found in the trash); *United States v. Harrison*, No. 5:22-CR-141, 2023 WL 2920278 (E.D. Ky. Apr. 12, 2023) (finding same), *aff'd*, 2024 WL 4950166 (6th Cir. Dec. 3, 2024).

Thus, in assessing the totality of the circumstances, the Court here concludes Magistrate Judge Gentry had a substantial basis for her probable cause determination in issuing Search Warrant 1.[3]

### B. <u>Search Warrant 2</u>

Detective Frederick Zollers ("Detective Zollers") served as the affiant and applied for Search Warrant 2 on February 15, 2024.[4] (Doc. No. 42-2 at PageID 187–88.) On that same day, Montgomery County Common Pleas Judge Richard Skelton issued Search Warrant 2, which authorized a search of the Residence. (*Id*. at PageID 189–93.) The events precipitating Detective

---

[3] Having found Magistrate Judge Gentry possessed a substantial basis for her probable cause determination, the Court need not delve into Wyatt's alternative good-faith reliance argument. *See United States v. Frechette*, 583 F.3d 374, 381 (6th Cir. 2009) ("There is no need to go into a lengthy analysis of whether the agents relied on the search warrant in good faith because the magistrate judge had a substantial basis for finding probable cause."). For the same reason, the Court does not reach the good-faith reliance exception in the sections designated for Search Warrants 2, 3, and 4.

[4] Wyatt incorrectly refers to the affidavit for Search Warrant 2 as the "3/5/24 Affidavit." (*See* Doc. No. 40 at PageID 124.) Although Search Warrant 2 was filed with the Common Pleas Court on that date, it was applied for and executed on February 15, 2024. (*See* Doc. No. 42-2 at PageID 189–93.)

Zoller's application for Search Warrant 2 began on February 15, 2024, when Detective Zollers observed what he believed to be a car-to-car drug transaction between a black Chevrolet Malibu and a black Lexus sedan in Trotwood, Ohio. (*Id*. at PageID 190.) Detective Zollers also observed the Malibu had excessively tinted windows. (*Id*.) Following the transaction, Detective Zollers maintained surveillance of the Malibu and initiated a traffic stop between the Residence and the adjacent home. (*Id*.) Shortly after Detective Zollers initiated the traffic stop, he observed a male, later identified as Isaiah Brooks, flee from the Malibu toward the back door of the Residence. (*Id*.) Law enforcement took chase and soon thereafter observed additional males flee from the rear door of the Residence. (*Id*.) The officers eventually apprehended two of the males, one of whom was later identified as Wyatt. (*Id*.) When additional officers came to assist, they noticed the rear door of the Residence was open and witnessed, in plain view, a firearm in the Residence. (*Id*.) The officers then conducted a protective sweep of the Residence and discovered a large quantity of suspected fentanyl in plain view in the kitchen of the Residence. (*Id*.) Consequently, Detective Zollers applied for Search Warrant 2.

In the same affidavit, Detective Zollers also recounts an event that occurred a few months prior at the Residence. (*Id*.) During that incident, on December 6, 2023, law enforcement stopped a van just outside of the Residence for a window tint violation. (*Id*.) The van fled but eventually crashed into a ditch, so the occupants exited the vehicle and fled on foot. (*Id*.) The officers noticed a discarded firearm near the van. (*Id*.) After chasing and apprehending the fleeing occupants, one of whom was identified as Wyatt, Wyatt admitted to discarding the firearm during a post-*Miranda* interview. (*Id*.) Residue collected from the gun tested positive for fentanyl. (*Id*. at PageID 191.)

Based on the February 15, 2024 events, the December 6, 2023 incident, and his knowledge of the execution of Search Warrant 1 in June of 2022, Detective Zollers applied for and executed

Search Warrant 2 on February 15, 2024. (*Id*. at PageID 193.) The execution of Search Warrant 2 yielded, among other things, methamphetamine and fentanyl, digital scales, firearms and ammunition, masks, drug manufacturing equipment, eight phones, and a DVR. (*Id*. at PageID 194–201.)

From what the Court can gather, Wyatt challenges Search Warrant 2 on two grounds. First, he believes the affidavit is devoid of any semblance of a nexus between Wyatt's status as a known drug dealer and the search of the Residence. (Doc. No. 40 at PageID 125–26.) In other words, Wyatt believes the purportedly attenuated evidentiary link between the suspected drug activity and the search of the Residence falls short of the probable cause standard. (*Id*.) But the Residence was not searched solely on the basis of Wyatt's reputation. In fact, the vast majority of the Search Warrant 2 affidavit is dedicated to recounting the events on February 15, 2024 and December 6, 2023. (*See* Doc. No. 42-2 at PageID 189–93.) While Detective Zollers does indeed attest to his prior knowledge of the Residence's operation as a drug stash house, the primary event triggering his application for Search Warrant 2 was that which occurred on that very day—when law enforcement attempted a traffic stop, chased the fleeing occupants of the vehicle and the Residence, observed a firearm in the Residence in plain view, conducted a protective sweep of the Residence, and located large quantities of suspected fentanyl in plain view. (*Id*.) Limiting the analysis to Detective Zoller's familiarity with Wyatt or the Residence's reputation, therefore, distorts the story told in the affidavit for Search Warrant 2.

Wyatt's second qualm with Search Warrant 2 is rooted in the legality of the officers' entry during the protective sweep. (Doc. No. 40 at PageID 126.) The Court can only speculate as to why Wyatt believes the initial entry was illegal. It is well settled that "[f]light from a law enforcement officer invites, even demands, pursuit." *United States v. Yates*, 501 F. App'x 505, 514

15

(6th Cir. 2012). What is more, officers are permitted to conduct a protective sweep during exigent circumstances. *See Lange v. California*, 594 U.S. 295, 322 (2021) (Roberts, J., concurring) ("We have repeatedly and consistently reaffirmed that hot pursuit is itself an exigent circumstance."); *see also United States v. Hill*, No. 22-5274, 2023 WL 152474, at *2 (6th Cir. Jan. 11, 2023) (finding the officers were justified in performing a limited protective sweep given the exigent circumstances). Finally, it is undisputed that "the plain view exception permits the warrantless seizure of objects dangerous in themselves," including firearms located during a protective sweep. *United States v. Harris*, 158 F. App'x 719, 725 (6th Cir. 2005) (citation and quotation marks omitted). For these reasons, Wyatt's second challenge to Search Warrant 2—the legality of the officers' initial entry into the Residence—also fails.

Accordingly, the Court finds Judge Skelton possessed a substantial basis for his probable cause determination in issuing Search Warrant 2.

### C. <u>Search Warrant 3</u>

Agent Buzzard applied for and executed Search Warrant 3 on March 3, 2025. (Doc. No. 42-3 at PageID 203.) Search Warrant 3, unlike the other three Search Warrants, authorized a search of the eight phones and DVR collected during the execution of Search Warrant 2. (*Id*. at PageID 204–05.) In the interest of brevity, the Court omits much of the facts presented in the Search Warrant 3 affidavit, as they are largely repetitive of those included in the affidavits for Search Warrants 1 and 2. (*See id*. at PageID 206–11.) In essence, Agent Buzzard recounts the events of his initial investigation of the Residence around August of 2021 through the execution of Search Warrant 2, when the eight phones and DVR were recovered. (*Id*.) Agent Buzzard also notes that one of the phones, which was found in the vehicle used in a prior car-to-car drug transaction, was associated with subpoenaed records. (*Id*. at PageID 209.) Agent Buzzard's investigation revealed

that same phone was identified by a drug customer as that which they would call to order narcotics. (*Id.*) Another phone, located in the Residence, was the phone associated with a number which one of the confidential informants called to purchase fentanyl. (*Id.*) Based on his experience, Agent Buzzard believed a search of the phones would reveal evidence of coordinating drug transactions, and a search of the DVR would uncover a video recording of visitors coming and going from the Residence. (*Id.* at PageID 210.) Magistrate Judge Gentry issued Search Warrant 3 on March 3, 2025. (*Id.* at PageID 215.)

Wyatt's only opposition to Search Warrant 3 rests on the fact that, because Search Warrant 3 essentially repeats all the facts included in Search Warrants 1 and 2—which, according to Wyatt, do not meet the probable cause standard—Search Warrant 3 necessarily fails. (Doc. No. 40 at PageID 126.) Having already concluded Search Warrants 1 and 2 are not lacking, and here independently finding Search 3 is sufficient, the Court further concludes Magistrate Judge Gentry possessed a substantial basis for her probable cause determination in issuing Search Warrant 3.

### D. <u>Search Warrant 4</u>

Agent Buzzard applied for Search Warrant 4 on June 30, 2025. (Doc. No. 42-4 at PageID 244.) On that same day, Magistrate Judge Gentry issued Search Warrant 4, which authorized a search of the Residence. (*Id.* at PageID 244, 248.) Agent Buzzard begins the affidavit by reiterating the events leading up to Search Warrants 1 and 2. (*Id.* at PageID 249–50.) Agent Buzzard goes on to detail more recent events, including law enforcement's enlistment of a new confidential informant ("CS4")[5], who knew of a drug trafficking operation in Trotwood, Ohio. (*Id.* at PageID 250.) CS4 advised that members of the operation used a particular phone number to communicate

---

[5] Search Warrant 4 refers to CS4 as "CS1." (*See* Doc. No. 42-4 at PageID 250.) For the sake of the clarity of this Order, the Court refers to the final confidential informant as "CS4."

with drug customers. (*Id*.) According to Agent Buzzard, CS4 agreed to participate in a controlled buy. (*Id*.)

Under officer supervision, CS4 placed a call to the phone number linked to the drug operation. (*Id*.) "Task Force members overheard a male subject answer the number and agree to sell [CS4] an amount of fentanyl." (*Id*.) Prior to meeting with the seller at the agreed-upon location, the officers searched CS4 and their vehicle for contraband. (*Id*.) In a neighborhood near the Residence, the driver of a gray Hyundai sedan exchanged fentanyl for law enforcement buy funds with CS4. (*Id*. at PageID 250–51.) The officers thereafter observed the same Hyundai sedan return to and park near the back of the Residence. (*Id*. at PageID 251.) Law enforcement also witnessed Wyatt exit the driver's seat of the Hyundai sedan and enter the Residence. (*Id*.)

About a week later, on May 15, 2025, Agent Buzzard noticed a white female in a red sedan parked in the same neighborhood as the Residence, waiting for over an hour. (*Id*.) At that same time, other officers watched as Wyatt and two other individuals exited the Residence to change the license plate on the same Hyundai sedan used in the previous controlled buy with CS4. (*Id*.) Shortly thereafter, officers observed the Hyundai sedan leave the Residence, meet the female in the red sedan, and perform what they believed to be a hand-to-hand drug transaction. (*Id*.)

A few weeks later, law enforcement arranged another controlled buy with CS4 and an undercover agent. (*Id*.) Again, CS4 called the same number as before and ordered fentanyl from the male who answered the phone. (*Id*. at PageID 252.) Officers stationed near the Residence saw a black male driving a white Nissan sedan arrive at the Residence, park, walk to the fence line, retrieve a brown bag from the backyard around the fence line, and bring the bag into the Residence. (*Id*.) Fifteen minutes later, the officers observed two different black males leave the Residence and walk in the direction to the agreed location for the controlled buy. (*Id*.) The driver of the white

Nissan was thereafter seen picking up the two walking males. (*Id*.) The Nissan pulled up next to the vehicle with CS4 and the undercover agent, and the driver exchanged purple fentanyl powder for cash. (*Id*.) Following this transaction, the Nissan returned to the Residence. (*Id*.) The purple substance tested positive for fentanyl. (*Id*.)

In June of 2025, law enforcement arranged a third controlled buy by calling the same phone number and ordering fentanyl from the male who answered the call. (*Id*.) Just as before, the undercover agent was directed to a location in the same neighborhood as the Residence. (*Id*.) A black male driver and Wyatt as passenger were observed leaving the Residence and driving a gray Buick sedan to meet the undercover agent. (*Id*. at PageID 252–53.) And again, the driver of the Buick exchanged a purple substance for funds. (*Id*. at PageID 253.) The substance tested positive for fentanyl. (*Id*.) Based on the information provided by CS4, the officers' independent surveillance, and the three controlled buys, Agent Buzzard applied for and executed Search Warrant 4 on June 30, 2025. (*Id*. at PageID 255.) The search revealed firearms and ammunition, suspected narcotics, scales, baggies with suspected drug residue, phones, and a DVR. (*Id*. at PageID 263–71.)

As with his argument regarding CS3 in Search Warrant 1, Wyatt takes issue with the fact that CS4 is "unvouched for." (Doc. No. 40 at PageID 127.) But as delineated above, a confidential informant need not have participated in investigations in the past to be credible, and, even where the affiant's assertion of an informant's reliability is somewhat cursory, that issue may be resolved with independent investigatory corroboration. *See Simpson*, 706 F. Supp. 3d at 733; *Woosley*, 361 F.3d at 927. For his final argument, Wyatt emphasizes that the second controlled buy involved three individuals who came from the Residence, but none of whom were Wyatt. (Doc. No. 40 at PageID 127.) Similarly, Wyatt highlights the fact that he was merely the passenger, not the driver

or primary seller, involved in the third controlled buy. (*Id*.) The Court reminds Wyatt that Search Warrant 4 provided for a search of the *Residence*. And while Wyatt was indeed searched during the execution of Search Warrant 4, that fact is incidental, because Wyatt just so happened to be in the Residence when it was searched. (*See* Doc. 42-4 at PageID 267 (listing items found on Wyatt's person during the execution of Search Warrant 4).) At bottom, an affiant need only establish "a nexus between the place to be searched and the evidence sought." *Williams*, 544 F.3d at 686. Agent Buzzard here did just that by describing three separate controlled buys, wherein the sellers— whether they be Wyatt or his cohorts—left the Residence, entered into drug transactions, and returned to the Residence, which was the subject of Search Warrant 4. (*See* Doc. No. 42-4 at PageID 250–53.)

In sum, Wyatt's scruples with Search Warrant 4 are unfounded, and Magistrate Judge Gentry had a substantial basis for her probable cause determination in its issuance.

## IV.    <u>CONCLUSION</u>

Based on the foregoing, the Court hereby **DENIES** Wyatt's Motion to Suppress Fruits of Search Warrants (Doc. No. 34) and Supplemental Memorandum (Doc. No. 40) in all respects.

**DONE** and **ORDERED** in Dayton, Ohio, this Thursday, January 29, 2026.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE